Good morning, Your Honors. Good morning. My name is Richard Wall. I represent Mr. Kinerson. May it please the Court, Counsel. Can you maybe raise that microphone a little bit so we can hear you and your fans out in the ether can hear you as well since this is being recorded. Okay, is that better? Good. Thank you. Thank you. This case is really about officers who use force to try to resolve a situation quickly rather than waiting to get full information and seeing what quickly has been well-established in this circuit at least that it's not a justification for the use of force. Counsel, let me say first of all, I have deep sympathy for your client, both for his medical condition and for what happened here. I'm just grateful that only a taser was involved and not a firearm. But, I know you'd say a taser is a firearm, but the reality is the Supreme Court, as Polly reminded us, that what we're looking at here is the reaction of the reasonable officer on the scene entitled to protect his or her life. Admittedly, your client may not have had full control, but when the call came in earlier, there was an indication that he was armed, he was, you know, not rational, and he was doing things. I know he had a problem with his arm, but he was trying to reach down to his waist, and the officers thought, presumably, that they had some risk. And then when he was down the second time, he would not submit until they used the taser a second time. Whether we would have done the same thing isn't the issue, but aren't we stuck by Supreme Court precedent that says that if the officers had a reasonable belief that they were in fear of harm, that they could act? If they had a reasonable belief, but if you look at the facts, as you must, in the light most favorable to Mr. Kinison at this stage, well, is that true? That is still the law. That is still the law. Under White versus Polly? I believe it is still the law. We're still at summary judgment. I wrote Lopez. You're probably familiar with Lopez. I greatly sympathize with you in that kind of, in certain situations, but this is quite different, is it not? I district court went wrong here, is that the Supreme Court still says you have to make that decision. The officers have to have an objective belief that they're in imminent, at imminent risk of harm, and it has to be, that objective belief has to be based on the totality of the circumstances. They cannot pick and choose, oh, I know this information. I'm going to ignore this information in this case. They have to factor in all the information that's available to them. Let's talk about the information that was available to him, because it's not clear that the deputies read the text information that was relayed by the county dispatcher. So maybe you can, you know, outline for me the other evidence in the record that you think supports why the deputies should have knew about Henderson's medical condition. First of all, that was, that information was, that he was, that he had a special medical condition, was extremely sensitive to touch, was given to them by the sister who made the report in the first place. It was given to the dispatcher. Yes. All right, but the police officers on the scene didn't know about that. We don't know that from the record. Okay, we don't know that because it's not clear, but from what we do know, one of them said they didn't look at the text. What can you point to me to make me think that they did know about the text? Well, Your Honor, there's no way that I can, or any plaintiff in this circumstance, can prove what, if an officer says, I didn't hear that, I didn't read that, but that's why you have juries decide these cases. They decide whether that's a reasonable, whether that actually happened or not. The fact is, the information was readily available to them, and now they claim they didn't know or they chose to ignore it. They're not allowed to do that. Objectively, they have to consider all the information that's available to them. And here's the most important part of this case. When they arrived at that parking lot, first of all, they only had a report. They knew nothing about the person reporting this. They had no reason to judge whether it was true or not. They were simply investigating because it was a report. No, but they did hear, they did acknowledge that they had heard over the radio. Yes, but they don't know who's doing the reporting. They don't know what that person's biases may be or what their intent is. So it's simply a report. It's not an established fact. Counsel, with respect, I'm sure you're a very fine lawyer, but I think you deeply misunderstand the Supreme Court's qualified immunity. This is just not accurate what you're telling us. An officer on the scene has no obligation to investigate the biases of somebody making a report. They're there. They come across this gentleman. They don't know about the necessary medical issues. And even if they did, even if they did, if they had to believe that they were in serious danger of harm, they have a Supreme Court? Probably not in a lot of cases, but the reality is they're the Supreme Court. They give us the law. They give us the instructions, and we have to follow them. And we don't get to a jury, like we would in a normal circumstance, if the standard for qualified immunity is met. I don't like it, really, but how can we ignore that? Well, I'm not asking the court to ignore that. The only point I'm trying to make here, and I'm running out of time, is that no reasonable person would act on a — as if something is a fact when all they have is an unconfirmed report. That's not the rules, counsel. If that was — if they could — if they could act in that manner, just on an unconfirmed report, they could simply have shot Mr. Kinnison on the spot because they believed everything they heard on the — on the dispatch report. But what are you — you're suggesting that the officers have to say, wait a minute, Mr. Kinnison, we need to go investigate the biases of the person making the report, see whether it's accurate. That's absurd. No, I'm not suggesting that at all. But I'm saying they have incomplete information when they arrive at the parking lot. Of course they do. Okay. Of course they do. That's all I'm pointing out. Every police officer has that. You don't have the full information. But when they come to investigate, they are there. They're trying to carry out their duty. And if they feel like they are in danger of imminent physical harm, they have a right under the Supreme Court's rules to act. Now, you might not do it that way. I might not do it that way. There are some really sad situations like we had in the Lopez case. Thirteen-year-old boy gets killed for seemingly no particular reason. And that one did go to the jury, at least so far. They're going to maybe appeal to the Supreme Court. But this is not that. Well, it may not be Lopez. But what I'm trying to express here is that when the officers arrived on that scene, they knew there was a report and what was reported. And they knew that Mr. Kinderson was on the phone to dispatch trying to communicate with them. You say they knew the report and what was reported. In your view, what did they know? They knew that it had been reported that he was armed and potentially suicidal and had made statements in the past of something about taking someone down with him. And but, again, they knew very little at that point. He was in Mr. Kinderson was in his car. He had not broken any laws. They had every right to investigate. But he was on the phone trying to communicate with them. And he was telling dispatch, I'm not suicidal. I'm not going to hurt anybody. I just want to go rest somewhere. And what was the first thing the officers do? They get out of their cars and draw their guns and put him in fear of his life. That in itself is unreasonable under those circumstances. So is it your position that it was excessive force from the very beginning or is at some point it crossed the line? I think this court could actually say yes, because when you pull a weapon out and point a weapon at someone, that's a use of force right there. But is it excessive given the facts that the officers knew? Yes. Why would they point a gun at this person based on the limited information that they had knowing he was on the phone? They were informed, excuse me, they were informed, the deputies were, that Mr. Kinderson was potentially suicidal and had made statements that he might take others down with him. He exited the vehicle without being told to exit the vehicle. And at one point he reached for his waistband. He clearly had some black objects on his waist or a belt containing objects on his waist. And they had to react. With all due respect, Your Honor, the facts you just stated are only true if you take all the facts in the light most favorable to the defendants in this case. Mr. Kinderson said he was ordered to get out of the car. The officers didn't describe objects on his waist until they had already tasered him. That's my, I believe, is what the record indicates. And that's not why they tasered him. The officer who tasered him said he tasered him after he saw him pull up his shirt. Not reach for his waistband.  Counsel, let me ask my colleagues, anybody have any additional questions? Thank you, Counsel, you've used your time. Let's hear from the government. Good morning, Your Honors. Good morning, Counsel. May it please the court, my name is Heather Yakely and I am with Evans, Craven, and Lackey here on behalf of Spokane County and the individually named defendants. Obviously, listening to the questions that the court was posing to Mr. Wall, I would like to just start with providing some citations to the record. You can stop me at any time, because it does appear that you are well informed with that record. Mr. Wall's argument is a typical qualified immunity argument. There's no dispute about that. So, what I'd like to do is point out the facts that we are accepting, in light of Mr. Kinnerson. So, we are accepting that there was a medical condition, and that's, you can find that very clearly in the CAD. If you look at the three officers' declarations,  one of the three remembers additional information from dispatch that wasn't in the CAD, and that's actually fairly good two years later to remember additional information, and that's, excuse me, at the time he was a corporal, Justin Elliott, and he specifically did provide for the record that he was aware of, dispatch also advised that Mr. Kinnerson's sister reported, excuse me, that he had medical problems, always carried his handgun, and had talked about taking people down with him, and that's at- What's the ER on that, please, counsel? That's supplemental 157. SER- SER 157. Thank you. But then we also have the CAD, and the CAD is the information that they did know, the officers did know prior to arriving on scene, and you can look at the CAD, which is at page ER 117, and it'll tell you the information that they most likely heard or knew before arriving on scene, and those are that the brother made a suicidal statement left at 2200, possibly has a handgun, he made a statement of taking people down, and it does say medical problems, but there isn't any indication as to what that medical problem is. But nonetheless, again, accepting the facts in light of Mr. Kinnerson, two of the deputies recognized that there was something wrong with his right arm, that's not disputed, and they recognized it, but there's a left arm that is still completely functional. Mr. Kinnerson also- Help me with this. It was the right arm that had the medical condition, is that correct? Yes, your honor. I just wanted to look at my notes to make sure. And the little things on the belt were electrical whatevers that helped the device with his arm, is that correct? Yes, your honor. Okay. It's a TENS unit. It's a portable one. They're fairly small. It's dark. They're not close enough to see anything. So anyway, Mr. Kinnerson also states that he wasn't yelling or swearing, and Mr. Kinnerson submitted that that also creates a question of fact. It may create a question of fact as to whether or not he was yelling and swearing, but that doesn't change the material facts which entitle the officers to qualified immunity, which is- You were just referring to the officers and what you acknowledge because I just want to make sure I understand. After the first tasing, I think it's Officer Elliott testified that he had a bad arm condition, and then I think it was Officer Jones testified he became aware of it after the second tasing. But taking the facts and the lie most favorable to Mr. Kinnerson, is it true that throughout, I guess, Mr. Kinnerson was telling the officers or told them on several occasions that he had a bad arm? It is, Your Honor, and unfortunately, in these types of situations, unfortunately for generally the plaintiffs or the suspects, that's a subjective statement. I recognize that we all assume that somebody is telling the truth, but that's not objective. In other words, the officers are faced with the objective, their visuals, so what they can see with respect to what's on the waistband, with what they can see in his arm, one goes up, one goes down. I guess, tell me why you think that the second tasing was necessary. I believe it was necessary, Your Honor, because it's set forth in Justin Elliott's deposition as well as, I believe, Deputy Jones's at Supplemental Excerpt 157 and Supplemental Excerpt 167. Both of those deputies testify that even though they may have some awareness of a condition, they can't provide aid until that person is under control. Using the taser was the better option at that point in time because Justin Elliott had been trying to get his arm behind his back. That was obviously causing him more pain. Using the taser, I recognize that many people have differing opinions on the use of a taser, but in reality, it was a one to two second drive stun, which is not using the probes. It is a pain compliance technique, but pain compliance techniques are also body strikes. They're well accepted by courts when they're objectively reasonable. In this case, the use of the taser on that one to two second burst immediately gained Mr. Kinnerson's compliance. Mr. Kinnerson's condition, by his own testimony, will be better served by hands off, which is exactly what happened. As soon as Mr. Kinnerson calmed down, they felt like he was no longer a threat. In other words, they could check his waistband to make sure it wasn't a gun. He did have a knife, but to make sure that there were no weapons and that he was calming down, they were able to actually take that other handcuff off. So they never handcuffed him. As soon as he became compliant, all force backed off. Isn't that the reality, perhaps a very sad reality, that given the current state of the Supreme Court's view of qualified immunity, if the officers hadn't had tasers on their person but did have firearms and felt threatened, they would have been entitled to shoot Mr. Kinnerson? Yes, Your Honor. Under the circumstances, tragic though they are, they applied a lesser force, thinking that they would be safe still and yet bring, in this case, the appellant into compliance. Is that a fair statement? That is, Your Honor. They were fortunate that they had three officers there. Mr. Kinnerson was fortunate that they were all actually very experienced because, yes, one of them, and I recognize it was an issue raised by Mr. Wall, did raise his gun when he saw Mr. Kinnerson reaching down. The gentleman who deployed the taser had been on the SWAT team and he had 140 hours a year, including that additional training. It was a very, very good use of force that went, quite frankly, as well as possible given the situation and the information, the objective information that they were given at the time. Can you please address for just a moment again how dark it was when this incident occurred? It was midnight, Your Honor. It was in a church parking lot, but, you know, so there may have been some ambient light. There was a portico, I believe, that they actually took Mr. Kinnerson to after he was compliant. So there may have been some ambient light, but that didn't change the fact that they were unable to effectively establish what he did or did not have on his person. Any other questions, Your Honors? There was some question about the judicial admission. Do you want to comment on that, please? Sure. And I'll just say that that probably was not one of my better moves, but the reality of it was that, with my experience with Judge Quackenbush, you were better off to simply state from the very beginning where you recognize your problems are. And the argument, and he may or may not have agreed with that, was that there can be questions of fact, but they have to be material. And that was one of the things that I was pointing out when I said, look, here's what we accept, but it doesn't change the undisputed facts that are material. So, in other words, it's not necessarily material whether they were yelling. It's not necessarily material whether or not Mr. Kinnerson was trying to show them their shirt because that's the subjective component of it. So, from your perspective, the facts that you admitted were not material and would not bear on the qualified immunity issue? Yes, Your Honor. I believe that the biggest issue on that was Mr. Kinnerson, for the first time, raised that they had kicked him, and there's no indication of that in the record. My submission is, and we talked about that very briefly with respect to a taser versus a body strike. Obviously, I submit that it's not in the deputies' reports. They are obligated to say if there is a strike used. Those reports are very detailed, and they do say, yep, we used a taser. This is exactly what we did. This is how we did it. So, from my perspective, I was simply raising the issue that, yes, there's disputed facts. Those are not relevant to the material facts. Other questions by my colleague? Thank you very much. Thank you, Your Honor. Thanks to both counsel for your argument in this case. The case just argued is submitted.
judges: M. Smith, Murguia, Gordon